NOT DESIGNATED FOR PUBLICATION

No. 113,478

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REY MANUEL ACOSTA-FELTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed June 3, 2016.
Affirmed.

*Joanna Labastida*, of Kansas Appellate Defender Office, for appellant.

*Jeremy J. Crist*, assistant county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., BRUNS, J., and WALKER, S.J.

*Per Curiam*: Rey Manuel Acosta-Felton appeals the district court's denial of his presentence motion to withdraw his no contest plea to one count of battery of a correctional officer. Since we find that the district court judge did not abuse his discretion, the denial is affirmed.

FACTS

This appeal represents the third time this particular case has been on our docket to consider the same basic issue, *i.e.*, whether Acosta-Felton should be permitted to

1

withdraw his no contest plea to charges of battery of a correctional officer. His contentions on each occasion have been that his attorney misled him at the plea hearing, resulting in his lack of knowledge of the sentence he might receive. Since the parties are quite familiar with the history of this case, we will only provide a broad sketch of the prior proceedings before focusing on the specific issues now before us.

On or about November 10, 2009, Rey Manuel Acosta-Felton got into an altercation with correctional officers while being transported between cells at the Riley County Jail. The State charged Acosta-Felton with one count each of battery of a correctional officer, attempted battery of a correctional officer, and obstruction of official duty.

On the morning of his scheduled jury trial, March 31, 2011, Acosta-Felton pled no contest to one count of battery of a correctional officer, and in exchange for his plea the State agreed to dismiss the remaining counts in the complaint as well as dismissing all charges pending against Acosta-Felton in an older Riley County case. An additional benefit of the plea agreement was an agreement with the Geary County Attorney for dismissal of a case in that county. According to the written plea agreement, which was signed by Acosta-Felton, Stephen W. Freed (Acosta-Felton's attorney), the Geary County Attorney, and the Riley County prosecutor, the parties anticipated that Acosta-Felton would fall within a category of A for criminal history scoring purposes. There were no agreements pertaining to sentencing, other than the State's agreement not to seek a fine. Under the agreement, each party was allowed to argue their respective positions, including making departure requests, without limitation at the sentencing hearing. In the plea agreement and the accompanying waiver of rights form, Acosta-Felton stated he understood that by pleading no contest he could be sentenced to prison for a term of no less than 31 months and a maximum term of 136 months, depending on his prior criminal history, and the judge would not be bound by any of the agreements entered into by the parties.

At the plea hearing, the district court judge verified that Acosta-Felton read the plea agreement and accompanying waiver of rights form with the assistance of an interpreter, that he had an opportunity to speak with Freed about the agreement, and that no one threatened or made Acosta-Felton any promises with respect to his plea. The judge accepted Acosta-Felton's plea as "knowingly, voluntarily, [and] intelligently" made and found him guilty of battery of a correctional officer.

Acosta-Felton's case proceeded to sentencing on April 26, 2011. Upon the commencement of the hearing, Freed announced that he believed his client was "now wishing to . . . withdraw his plea," and when the district court asked his basis for the withdrawal, Freed stated, "He's saying I didn't explain everything to him."

Based upon the district court judge's experience at the plea hearing, he denied Acosta-Felton's request without questioning him or allowing any arguments on the motion. The sentencing hearing proceeded immediately. The court denied Acosta-Felton's request for a downward durational departure sentence of 32 months and imposed the standard presumptive sentence of 130 months' incarceration followed by 24 months' postrelease supervision.

Acosta-Felton timely appealed the denial of his motion to withdraw his plea. Specifically, he contended that the district court deprived him of due process when it denied his request to withdraw his plea without allowing him to speak or permitting any arguments on the motion. See *State v. Acosta-Felton*, No. 107,199, 2012 WL 5519183, at *1 (Kan. App. 2012) (unpublished opinion). A panel of this court agreed, finding that the district court abused its discretion because the court did not inquire of Acosta-Felton or expressly mention any of the factors outlined in *State v. Edgar*, 281 Kan. 30, 127 P.3d 986 (2006). 2012 WL 5519183, at *2. The panel explained:

"Although we are mindful of the fact that the district court was obviously very familiar with what occurred at the plea hearing and respect the right of the district court to exercise its discretion in determining whether a plea may be withdrawn, we are duty bound to follow the precedent established by the Kansas Supreme Court. [Citation omitted.] And as our Supreme Court has made clear, a 'district judge's failure to apply the appropriate standards in [a] plea withdrawal hearing [is] an abuse of discretion requiring reversal and remand.' [Citation omitted.]" 2012 WL 5519183, at *2.

This court reversed and remanded Acosta-Felton's case for a hearing to decide whether there was good cause for him to withdraw his plea based on the *Edgar* factors. 2012 WL 5519183, at *2.

After the remand, the district court held an evidentiary hearing on March 15, 2013, during which the judge listened to testimony from Acosta-Felton. Significantly, prior to calling Acosta-Felton to the witness stand, Andrew Vinduska, Acosta-Felton's new attorney, informed the court that he had recently spoken with Thomas Johnson, an attorney who was representing Acosta-Felton on a related federal matter, and Johnson divulged information that might be "somewhat pertinent to this proceeding." Vinduska believed the information would probably be even more pertinent in an ineffective assistance of counsel proceeding, if that in fact occurred sometime in the future, and therefore represented to the court that both he and Acosta-Felton did not wish the judge to consider any ineffectiveness on Freed's part during the hearing. Vinduska asked that the court decide the matter solely on the basis of the three *Edgar* factors.

At the hearing, Acosta-Felton testified, through an interpreter, that due to Freed's incompetence, his plea was not fairly and understandingly made because when he entered the plea, he mistakenly believed that the plea agreement guaranteed him a sentence of no more than 36 months. Acosta-Felton explained that he was a native Spanish speaker, and although he understood a little English, he could not read documents written in English. Likewise, Acosta-Felton maintained that he only had a rudimentary ability to converse in

English which made it difficult for him to be understood by others. Acosta-Felton complained that despite his limited understanding of the English language, Freed did not properly account for the language barrier during his visits with Acosta-Felton at the jail. Acosta-Felton contended he was told one thing by Freed in jail but events in court did not match what he was told, and he was unable to object or stop the proceedings. Acosta-Felton acknowledged that Freed did bring an interpreter with him to the jail once, but Acosta-Felton maintained that during this visit, a 32-month prison sentence was the only penalty discussed.

Acosta-Felton explained that he was confused because there were several different plea agreements presented to him, one for 32 months' imprisonment and one for 36 months' imprisonment, and he signed them both. But since the plea agreements were both written in English, and because Freed encouraged him to sign the agreements without making an interpreter available to him, he did not fully understand what he was signing.

According to Acosta-Felton, Freed first presented him with an agreement that required him to plead no contest to one count of attempted battery on a correctional officer, in exchange for a dismissal of the remaining charges and the charges pending in the older Riley County case and the Geary County case. With respect to sentencing, this first agreement provided that Acosta-Felton agreed to the service of a prison sentence of 32 months. Freed presented this agreement to Acosta-Felton in the presence of another lawyer, and according to Acosta-Felton, both of them "just talked about the 32 months, sign here, and let's go." But Freed and the other attorney did not explain the plea agreement to Acosta-Felton in Spanish; instead, "[t]hey took notes down on paper and showed it to [him], and then they just asked [him] to sign there, and [he] signed" because "[he] didn't think it was that bad, 32 months."

Sometime later, however, Freed brought Acosta-Felton a second plea agreement, the agreement which was ultimately presented to the district court, and according to

Acosta-Felton, Freed did not have enough time to explain to him that a plea to battery on a correctional officer would carry a longer maximum sentence than attempted battery on a correctional officer because there was no interpreter present. In fact, Acosta-Felton explained Freed told him this second agreement called for a 36-month sentence but he did not understand why. Acosta-Felton claimed that if this plea agreement had been properly explained to him in Spanish, he would never have signed it.

At the conclusion of the hearing, the district court took judicial notice of the fact that on June 29, 2012, the Kansas Supreme Court placed Freed on a 6-month suspension from the practice of law for failing to offer competent representation to a client in a probate matter but denied Acosta-Felton's motion, finding that he failed to show good cause existed to set aside his plea. See *In re Freed*, 294 Kan. 655, 279 P.3d 118 (2012). (We note, parenthetically, that Freed voluntarily surrendered his license to practice law in Kansas on November 5, 2013, and our Supreme Court issued an order of disbarment on November 14, 2013. *In re Freed*, 298 Kan. 346, 312 P.3d 364 [2013].).

In his review of the *Edgar* factors, the judge specifically found that (1) Acosta-Felton appeared to have "some basic understandings of English" because on several occasions "it was clear to [him] . . . in court proceedings that [Acosta-Felton] understood some of the things that [he] was saying on the record"; (2) Acosta-Felton told the court at the plea hearing that he reviewed the plea agreement and the waiver of rights form with an interpreter and the court was of the firm belief that Acosta-Felton entered his plea fairly and understandingly; and (3) the record indicated that Freed's services did not rise to the level of ineffective assistance, as he negotiated a plea agreement that required some skill and knowledge because it spanned two counties, he appeared to be ready to proceed with the jury trial on the morning of Acosta-Felton's plea, he subpoenaed witnesses for trial, and he moved for a downward durational departure at sentencing.

Acosta-Felton timely appealed the denial of his motion to withdraw plea, and this case entered our docket a second time. In his brief, Acosta-Felton complained that at the March 15 hearing Vinduska indicated that he had information that related possibly to the ineffectiveness of Freed but chose not to pursue it.

After the appeal was filed, the State became concerned about the record in district court, and asked that the case be remanded to Riley County District Court for the presentation of additional evidence. The State was worried that Vinduska's elusive remarks "left a big hole potentially in the record" such that questions of fact might remain as to Freed's competence, and the State desired to "find out what it was that . . . Vinduska knew but [did not] relay." This court granted the State's motion on June 11, 2014, and the case once again made the familiar trip back to Riley County.

When the case made its curtain call on the docket, the district court held another evidentiary remand hearing on December 12, 2014, during which it heard testimony from Acosta-Felton, Vinduska, and Freed. Acosta-Felton, who testified through an interpreter to supplement his testimony from the prior hearing, once again maintained that Freed was wholly incompetent in his dealings with Acosta-Felton, and Acosta-Felton was misled, coerced, and unfairly taken advantage of during the plea negotiation process. Similar to the prior hearing, Acosta-Felton submitted the two plea agreements Freed provided him as evidence, and he insisted that Freed never informed him that the State had imposed a deadline on the first plea agreement, which offered him a 32-month sentence. When asked if Freed provided any explanation as to why he was receiving a second plea agreement, Acosta-Felton replied through the interpreter:

> "THE INTERPRETER: He came with that paper and he just said that the 32 months were not gonna be 32 months anymore, and that they were gonna be 36. That he was gonna have six months in the rehab, anger management rehab, and 24 months of probation—

7

. . . .

> "THE INTERPRETER: . . . He told him, [Freed] told him that that deal was better for him because he only had one more month left to go free, and he would finish his 29 months in between those times. He told me that . . . it was sure. That the same as his 32 months agreement. Plea agreement. That nobody was lying to him."

In addition, Acosta-Felton alleged that Freed neglected to properly seek potentially exculpatory evidence and investigate his innocence and/or the possibility of presenting a self-defense claim. Acosta-Felton's newly appointed counsel, Britain Stites, explained that Acosta-Felton filed a federal lawsuit against the Riley County Police Department, its director, and four correctional officers, and during the course of that lawsuit, the director testified in a deposition about the video system in the Riley County Jail and he noted that "'[the booking officer] erroneously thought the camera system was broken, when it was not.'" Stites further indicated that he had received information suggesting that disciplinary complaints involving the use of excessive force may have been filed against one of the involved officers prior to the altercation at issue in this case.

Vinduska testified the information he had alluded to at the prior hearing involved the jail director's deposition. The director had testified that there was no record of the jail's video recorder system malfunctioning. This was contrary to the jail supervisor's testimony in the district court that the video recording system at the jail had not been working at the time of the altercation with Acosta-Felton and thus there was no recording of that incident. Vinduska had no other information about this matter, however, and he indicated that he opted not to present these facts at the prior hearing because he did not necessarily consider it to be relevant to Freed's competence and believed the information was more appropriate for a *Van Cleave* hearing, which focuses on issues involving the effective assistance of counsel. See *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986).

8

Freed, on the other hand, testified that while he did not seek any discovery regarding disciplinary actions against any of the correctional officers involved in this case, he submitted a request for discovery to the prosecutor's office on November 2, 2010, and he specifically requested any videotapes of the events which precipitated Acosta-Felton's charges. Freed further explained that at Acosta-Felton's preliminary hearing, he asked whether any video footage of the incident between Acosta-Felton and the officers existed, and was told by a jail supervisor that no such tape existed. Freed indicated that he was also told that after 30 days the tapes in the video cameras were erased and reused. Therefore, Freed did not file a request for the evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because even if the jail supervisor was wrong about the functionality of the video system, the footage would have already been recycled, as 30 days had long since passed.

Freed further testified that he had met with Acosta-Felton at the jail 10-15 times and during those visits communicated with Acosta-Felton in English. He was confident that Acosta-Felton understood him because, in his opinion, Acosta-Felton had a general understanding of the English language. In fact, Freed explained, his interpreter told him Acosta-Felton actually knew more English than he was leading people to believe.

Freed was aware that Acosta-Felton had felony charges pending against him in Geary County. Freed drove to Geary County to speak with Linda Barnes-Pointer, Acosta-Felton's attorney on that matter, about trying to work out a plea deal that would incorporate both the Riley County and the Geary County cases together. According to Freed, he and the prosecutor were then able to agree upon the plea agreement which involved Acosta-Felton pleading to 32 months' imprisonment. Freed explained that the prosecutor imposed a deadline on this agreement, and while he could not recall the precise dates, he believed the agreement was drafted on a Thursday and the deadline was "like five o'clock on a Friday." Freed maintained that he met with Acosta-Felton on Thursday and Friday, and Freed specifically recalled telling Acosta-Felton that there was

a deadline. If Acosta-Felton did not take the plea agreement, there was a possibility that the prosecutor would not offer this same plea agreement in the future.

According to Freed, Acosta-Felton did not initially want to accept the plea agreement and the deadline passed. Nevertheless, while Barnes-Pointer was unable to come down to the jail prior to the passage of the deadline, she and Freed met with Acosta-Felton about the plea agreement on Saturday morning. When asked if he informed the prosecutor that Barnes-Pointer would be unavailable until after the deadline, Freed could not recall whether he had done so and did not remember asking the prosecutor for an extension until the Geary County defense attorney could be available.

Freed explained that after he and Barnes-Pointer spent a considerable amount of time discussing the pros and cons of the plea agreement with Acosta-Felton, he ultimately agreed to accept the plea offer. Consequently, on Saturday morning or early afternoon, Freed went to the prosecutor's office to discuss the possibility of moving forward with the expired plea agreement. The prosecutor, however, refused to extend the deadline. Because Acosta-Felton's trial was scheduled to occur within the next 10 to 11 days, Freed brought clothes down to the jail for Acosta-Felton to wear and the two of them started discussing trial preparations.

In the meantime, however, Freed continued to engage the State in plea negotiations, and eventually, the prosecutor offered the plea agreement for 36 months' imprisonment, the agreement that was ultimately filed with the district court. According to Freed, he met with Acosta-Felton about this agreement two to four times while doing trial preparation. Freed indicated that Acosta-Felton did not initially understand why the first plea agreement was off the table. Freed explained that the prosecutor was unwilling to extend the deadline, and because Acosta-Felton was unwilling to agree to the plea agreement within that time period, the first plea agreement was no longer available.

10

Freed also claimed that he discussed the differences between the two plea agreements with Acosta-Felton, and he was confident that Acosta-Felton understood that the second agreement provided for "open sentencing," rather than a 32-month sentence, because Acosta-Felton was not happy about it. Moreover, Freed maintained that he also informed Acosta-Felton of the sentencing range associated with a conviction for battery on a correctional officer.

Freed indicated Acosta-Felton agreed to accept the second plea agreement the day prior to the commencement of his jury trial, and he signed the documents at the jail. The next morning, Freed, the interpreter, and Acosta-Felton met in the district court jury room, and the interpreter reviewed the plea agreement and waiver of rights form with Acosta-Felton in Spanish. Freed indicated that while he may have stepped out of the room a time or two, he was present most of the time that the interpreter was reading through the plea agreement and the waiver of rights with Acosta-Felton. Although Freed acknowledged that he did not provide Acosta-Felton with a Spanish copy of either of the plea agreements, he claimed that he had no reservations, whatsoever, regarding Acosta-Felton's ability to understand the consequences of accepting the second plea agreement: "I don't know if he wanted to do it, but he understood what he was doing."

At the hearing's conclusion, the district judge again denied Acosta-Felton's motion to withdraw his plea, finding that Acosta-Felton had failed to show good cause existed to set aside his plea because the evidence demonstrated that he received competent representation; he was not misled, coerced, or unfairly taken advantage of during the plea negotiation process; and his plea was fairly and understandingly made. With respect to Acosta-Felton's ability to understand the plea agreement, the judge found that Acosta-Felton, who had appeared before him on several criminal matters over the years and was clearly "not a rookie" to the criminal justice system, entered his plea with a full understanding of the consequences:

11

"[D]oes the law require that the written plea agreement be reduced to the defendant's primary language? I do not believe that it does. Under the circumstances I was absolutely, 100 percent convinced Mr. Acosta-Felton understood what the agreement said. It had been read to him by an interpreter. And further, Mr. Freed testified last week that he had explained the difference between the two plea agreements. He believed Mr. Acosta-Felton understood that, and in fact became angry when he discovered that it was going to be open sentencing versus the [32] months. I do not believe there was any confusion at all, based upon the fact that this agreement was not in Spanish."

Regarding Freed's alleged ineffective assistance, the court determined that Freed provided Acosta-Felton with competent representation. The judge likewise was not persuaded by Acosta-Felton's efforts to establish that Freed failed to seek exculpatory evidence and/or fully investigate his case:

"I want to point out that first of all, the crime that Mr. Acosta-Felton entered a plea of no contest to involved [a jailer], and not [the supervisor], so how any misconduct by [the supervisor] would affect Mr. Acosta-Felton's understanding of the plea agreement would be totally unrelated.

"At this point we're talking about was Mr. Acosta-Felton represented by competent counsel, and was the plea agreement entered into knowingly, voluntarily, freely. Any alleged past misconduct by [the supervisor] would not go to Mr. Acosta-Felton's knowingly and voluntarily accepting the plea agreement, and would not go to, you know, any threats or promises.

"Further, there's been no showing that Mr. Freed, who was Mr. Acosta-Felton's attorney at that time, had any knowledge of any past misconduct of [the supervisor]. I'm not sure how you can investigate something that you have no knowledge of, or not been given any information about, and it appears whatever information that may have been didn't come out until years later. As to the claim that the—there was a failure to seek exculpatory evidence, as the State has correctly pointed out, the many things that Mr. Freed did, one of which was a motion for discovery, which would include any exculpatory evidence. Mr. Freed was informed, and in fact there was testimony at the preliminary hearing that there was not any video evidence of the jail cell in which this offense took place, notwithstanding the fact that there is video recording equipment.

12

"Clearly Mr. Freed was acting upon the representation made by the County Attorney's Office and information from the preliminary hearing, it did not exist. And even if there had been a tape, as the State correctly points out, this preliminary hearing and Mr. Freed's appointment were almost a year after the incident in question, and as is standard procedure at the Riley County Jail to recycle the videotapes every 30 days, so if there had been video evidence on the date of the incident it would not have existed at the time the charges were filed against Mr. Acosta-Felton. In essence, we would be asking the State and Mr. Freed to provide something which didn't exist.

"Should it have existed? You can make certainly an argument that it should have been retained, but it was not. There's no showing that it was a deliberate bad faith, I won't call it necessarily destruction, but recycling of the tape. As indicated, that's their operating procedure, and there was certainly no deliberate refusal to honor the request. There's no evidence of either of those. And as I stated, there was a request made. I do not believe any of these *Brady* factors exist in this situation. Something cannot be exculpatory if it does not exist."

Likewise, the district court held fast to its determination that Freed provided Acosta-Felton with competent and diligent representation. The judge acknowledged that he was fully aware of the fact that Freed had been disbarred, but based upon experience with Freed over the last 16 years, he was not willing to "paint a broad brush to say that because he'd been disbarred for . . . not being competent or diligent" in his representation of another client that the same situation occurred in this case. The judge then reiterated the findings he made on the issue of Freed's competence at the prior hearing, including the fact that Freed "negotiated a very complicated plea agreement with Geary County and Riley County that resulted in the dismissals of three significant felonies in exchange for the plea." The court further noted that the evidence demonstrated that Freed also filed a motion for discovery and he visited Acosta-Felton at the Riley County Jail on several occasions, an assertion which the jail's visitor log fully supported.

Acosta-Felton filed this timely appeal, and once again the issue of his attempt to withdraw his plea is squarely before us.

13

Acosta-Felton contends that the district judge abused his discretion when he denied his presentencing motion to withdraw his plea because he sufficiently demonstrated that good cause existed to set aside his plea. The State, on the other hand, asserts that because the factual findings were sufficient and correct, this court should uphold his decision.

Prior to sentencing, a district court may, in the exercise of sound judicial discretion, withdraw a defendant's plea of guilty or nolo contendere "for good cause shown." K.S.A. 2015 Supp. 22-3210(d)(1). According to our Supreme Court, the "'good cause' standard" is "'a "lesser standard" for a defendant to meet,'" when compared to the manifest injustice standard required for a defendant advancing a postsentence motion to withdraw a plea. *State v. Macias-Medina*, 293 Kan. 833, 836-37, 268 P.3d 1201 (2012). When determining whether the defendant has shown good cause, Kansas courts generally consider the following three factors, commonly referred to as the "*Edgar* factors," after *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006): "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014).

These "'factors need not apply in a defendant's favor in every case, and other factors may be duly considered in the district judge's discretionary decision on the existence or nonexistence of good cause.' [Citation omitted.]" *Macias-Medina*, 293 Kan. at 837. Moreover, while these factors are "viable benchmarks for judicial discretion," district courts should not mechanically apply them, nor rely upon them to the exclusion of other factors. *State v. Aguilar*, 290 Kan. 506, 512-13, 231 P.3d 563 (2010). Additionally, when the defendant files a presentencing motion to withdraw a plea, the standard for determining the competency of counsel is less stringent than the

constitutional standard for ineffective assistance set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). See *Aguilar*, 290 Kan. at 512-13. "Merely lackluster advocacy . . . may be plenty to support the first *Edgar* factor and thus statutory good cause for presentence withdrawal of a plea." 290 Kan. at 513.

Appellate courts will not disturb a ruling on a presentencing motion to withdraw a plea unless the defendant sufficiently demonstrates that the district court abused its sound discretion. See *Fritz*, 299 Kan. at 154. A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) guided by an erroneous legal conclusion; or (3) based upon an error of fact. See *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014). When the parties challenge the district court's factual findings, this court reviews those findings under the substantial competent evidence standard. *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011). Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being adequate to support a conclusion. *State v. Schultz*, 289 Kan. 334, 340, 212 P.3d 150 (2009). When reviewing factual findings, however, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. See *Anderson*, 291 Kan. at 855.

Acosta-Felton claims that he established good cause to withdraw his plea because the evidence he presented in support of his request clearly satisfied all three of the *Edgar* factors, *i.e.*, (1) Freed provided ineffective assistance by neglecting to provide him with a Spanish copy of the plea agreements and/or utilize the services of an interpreter, allowing the first plea agreement to expire, and failing to sufficiently ensure that he was aware of its expiration and the differences between the first and second agreement; (2) Freed misled him into believing that he would receive a sentence of no more than 36 months by continually misadvising him of the contents of the plea agreements and failing to deal

15

with him in Spanish; and (3) Acosta-Felton's plea was not fairly and understandingly made because "he believed he would be receiving either 32 or 36 months in prison."

It is unnecessary to engage in a lengthy analysis of Acosta-Felton's argument because the facts recited above clearly demonstrate that the court did not abuse its discretion in this case, as substantial competent evidence fully supports its decision and it cannot be said that no reasonable person would have taken the view it adopted. Freed testified that (1) he dealt with Acosta-Felton in English because, in his opinion, Acosta-Felton had "a general understanding of the English language," (2) he fully advised Acosta-Felton of the consequences of entering a plea, (3) an interpreter reviewed the plea agreement with Acosta-Felton in Spanish, and (4) he had no reservations whatsoever regarding Acosta-Felton's ability to understand the terms of the agreement.

The district court obviously found Freed's testimony more credible on these matters than Acosta-Felton's. On appeal, our role is not to second guess or reassess that determination; we must give deference to the trial court's findings of fact. *Anderson*, 291 Kan. at 855.

Moreover, Acosta-Felton's contention that he did not understand the potential sentence he faced lacks credibility because although the court's plea colloquy was somewhat truncated, Acosta-Felton told the judge that he reviewed the plea agreement and accompanying waiver of rights form with his interpreter, which provide a detailed description of the parties' expectations with respect to sentencing; he acknowledged that he had an opportunity to discuss the agreement with Freed and that Freed provided satisfactory responses to his questions; and he contended that no one threatened or made him any promises with respect to his plea.

Furthermore, the same district court judge presided over the plea hearing and all of the withdrawal hearings and was therefore in the best position to discern whether Acosta-Felton's plea was fairly and understandably made. The judge had the opportunity to

16

observe Acosta-Felton and to determine the veracity of his purported inability to understand the contents of the plea agreement due to his difficulties with the English language. Moreover, Acosta-Felton and Freed provided widely divergent testimony regarding the circumstances surrounding the entry of Acosta-Felton's plea, and the judge who presided was in the best position to evaluate their testimony. The judge determined, based upon his observations of Acosta-Felton at the hearings in this case and his prior experiences with him on other criminal matters, that Acosta-Felton entered his plea knowingly and intelligently with a full understanding of the consequences. In other words, the judge concluded that the version of events Acosta-Felton advanced at the withdrawal hearings did not comport with what actually occurred at the time he entered his plea.

As explained above, it is not proper for this court to question the trier of fact's credibility determinations on appeal. See *Anderson*, 291 Kan. at 855; see also *Macias-Medina*, 293 Kan. at 839 (when the same judge presides over the plea hearing and the withdrawal hearing, that judge is in "the best position to resolve conflicts in the testimony and make the determination . . . [whether a] plea[] [was] knowingly and intelligently made").

To sum it up, the district judge did not abuse his discretion when he denied Acosta-Felton's presentencing motion to withdraw his plea because the evidence demonstrates that Acosta-Felton voluntarily entered his plea with a full understanding of the consequences.

Affirmed.